Bill's your argument next and, uh, her against twice. Good morning, your honor. Uh, David Abney for the plaintiff appellant. Morning. And just, let me just make sure. Can, uh, Mr. Jolson, can you hear me? Oh, good morning. Yes, sir. I can. Great. Uh, good. Good morning. So, uh, Mr. Abney, you may proceed. Thank you, your honor. I appreciate the opportunity to argue the case. I'm, uh, it's a little bit unusual for me. Usually I'm in my nice little home office in Phoenix. Uh, but my son is buying a condo in San Diego and it started to burn down on Thursday, so we came out to try to help them put it back together and, uh, they're still doing the repairs. So I'm sort of in a little weird lobby next to his, his, his unit and with be coming through with walking dogs or taking the kids to the park. I'll do what I can to deal with muting if that happens. But, um, it's, it's sort of, uh, it's sort of apropos in a way because, uh, the way the fire happened, uh, he was back in his, Sam was back in his bedroom and, uh, he was recovering from COVID. He was in the last couple of days of his COVID quarantine period. And, uh, he sees smoke come billowing under his door and the fire alarms go off and he hears the plumbers cursing. They had been welding and, uh, one of them yells, get a bucket of water. And this is not a good thing to hear, especially when there's electrical outlets all over the place where they were working. So the fire department comes, breaks down the wall, the buildings evacuated. It occurred to me, uh, as I was getting ready for the argument this morning, that what you have here is a classic situation of people reacting in panic to a dangerous situation. Uh, and that's one thing we don't want our police officers to do is to react in panic to a dangerous situation. This was, uh, a situation that could have gotten very much out of hand as far as, uh, officer, uh, Reif and, and, and Michael Weber, and it did get out of hand. Uh, there was a point earlier in the encounter where, uh, uh, Mr. Weber was inside his home and, uh, he was yelling, go away or I'll shoot you. And then he, but he stopped saying that. He, he came out of his home. He had the pistol in his hand, but wasn't pointed at anybody. It was pointed to the ground, went back in his home, came out, he came back out a second time. And that's when officer Reif shot him four times. Uh, I've never had a case before. I've had, I've had these excessive force cases before, but I've never had one where the, uh, the court said that he would assume with the fourth amendment rights, uh, and, and the, the court also concluded that officer Reif's body camera video did not show that Weber was pointing his, his weapon at officer Reif. And the district court inferred that Weber's gun was aimed at the ground when officer Reif opened fire. So we got all those hurdles, the traditional hurdles that you have to deal with are out of the way. And then, then we're down to the point where the court was focusing the attention on whether, uh, under the qualified immunity analysis, um, that it was clearly established officers Reif's use of lethal force was unreasonable. Mr. Abney, let me see if I can understand what's really disputed here. It, there's no question that Mr. Weber knew that officer Reif was a police officer and that officer Reif had commanded him to drop, uh, to come out without the gun. And nonetheless, he came out with the gun. Is that undisputed? Not entirely. Uh, I, I think reasonable jurors could say that, that, uh, that, uh, Mr. Weber should have known that the police officer there, he had yelled he was a police officer, uh, while, while, um, Mr. Weber was in. Didn't the reporting person testify that he heard from his, uh, trailer at least twice, the officer identify himself? Yes. Mr. Weber. Yes. Is there any evidence to refute that? No evidence to refute that, your honor. But what's, what would be important? I would assume with, with the jury think, well, because the, Mr. Weber's upset mental condition and that he was in the trailer, the really understand that he was dealing with police officer. That might be a factual dispute. It's not the strongest factual dispute I've ever heard of. What facts do you have to dispute? And it seems to me that the witnesses are all in agreement that the officer did identify himself and did order him to come out without the gun. And, and I guess it comes down to whether or not, if you're just pointing the gun at the ground after the officer has told you to drop it. Does the officer have to wait until he actually starts to raise the weapon? I mean, this is starting to sound like a shootout at high noon here. Who can draw first? No, I realized it's Arizona, but even so, uh, yes, you still have required the officer to wait that long. Well, even in Arizona and actually the, the shootout, the Oak Bay Corral was really a massacre by the Earps and Doc Holliday, they set that whole thing up. There's no question about that, but don't, but we can have that discussion some other time, but yes, but I don't mean to minimize the seriousness here, but I, you know, you've got a lone officer who has not yet taken cover himself in a very vulnerable position. And you've got a guy who by the report of the reporting, the reporting person has been threatening to kill somebody else in the trailer. Uh, and, and people who knock on the door, he threatens to shoot and he's got a gun. I mean, how, how much more does a reasonable officer have to know before he forms a reasonable belief that his life is now in danger and he needs to employ deadly force? Reasonable officer needs to understand that if, if you have a suspect standing outside with a weapon pointed at the ground, not threatening it, not threatening, not raising it, not doing anything, just standing there, that you can't shoot them. And there's a series of cases we discussed. I would totally agree with you if you didn't have the other facts of the fact that he'd been threatening to kill people shortly before the 911 call. And after the neighbor knocked on the door and I guess after the officer knocked on the door. Yes. But the, the point of the cases is that at the point where you've, you've got, you're on the edge of the, do I shoot or not shoot? What is the suspect doing? Was he making any threats at that time? No. Was he moving the weapon at any time to get it, to get it from anywhere from pointing at the ground? No. And if any actually gone, he was moving himself, right? He, in the sense that he, as he came outside and then he sort of half goes back in behind the door and then comes out again. Is that right? Yes. I mean, he's, he's essentially playing peekaboo with the officer. Well, he was, he was in plain sight, your honor. Oh wait, but he, he was in plain sight and then he wasn't. And then he reemerges, right? Yes. But even, even the district court said that the, the inference that he was going to take was that the weapon was indeed pointed at the ground at all time. And that as far as he was. That's fine. But I, my, my, my point is the, the, the, the sort of disappearing from view and then reemerging is the sort of furtive movement that could reasonably, you know, that the officer could reasonably take into account as sort of heightening the potential danger, right? And so, so to say that that's not enough, even with all of the prior behavior that Judge Tallman referred to really does seem like the rule you're asking for is just, you know, until the weapon is elevated, you, you, you can't shoot. Unless there's an immediate threat, there was no immediate verbal threat at that time, there was no immediate physical threat at that time, you don't get to shoot, but the officer could have done and should have done was to back away, make sure that he's, that he stayed undercover, got undercover, stayed undercover, wait for other people to arrive, engage in all of these activities that he was trained to do as far as deescalating the situation, which none of which you think there, you think there's a duty to retreat when the officer knows there's somebody else inside the trailer that Mr. Weber has threatened to kill. There's a duty not to shoot at that point because there's no immediate physical threat. There's no immediate verbal threat. It doesn't, what do we do with the fact? What didn't, wasn't he heavily intoxicated based on the, uh, the blood alcohol test that was done on autopsy? Yes, Your Honor. Okay. Did the officer testify that it appeared to him that, that Mr. Weber was under the influence? Well, no, not that I recall, but the, uh, what the officer said was that he thought that the weapon was indeed coming up, the district court got rid of that part, says, no, I looked at the body camera video, I'm going to take the  assume that the fourth amendment rights of Mr. Weber were indeed violated. That gets us to the point. Well, then we're dealing with the case law, the eight cases that we decided that we cited and discussed the two of them, which the district court cited and discussed, uh, and looking at those cases, uh, is it proper to shoot a suspect who is standing in front of you with the weapon pointed at the ground is not making an immediate threat to you or anybody else at that point. And it's not physical or verbal. What do you do? And what, what, what, I mean, you've, you've used the word immediate, uh, a number of times here. Uh, the, uh, you know, Graham against Conner is a totality of the circumstances test and so what, what is the basis for saying that, you know, because the I will concede is not immediate. Uh, but what, why, why does that mean that it should be discounted in the analysis? Uh, why isn't that on the contrary, in fact, a significant thing that the officer should take into account that the person just said, you know, I'm going to shoot you. Well, it wasn't just, just said sort of thing. It was earlier in the encounter. There's time is, is moving forward, but when you're talking about, was there anything in, in their interaction together that should have led the officer to conclude, well, he threatened to shoot me before, but it's now apparent that he's changed his mind. I mean, and I no longer feel threatened. Like what would have, would have led the officer to conclude that? There's no immediate threat at that point. That's all I, that's all I can say about that as far as time comes in and out. Your argument really does come down to, he had to have been raising the firearm before the officer could shoot. We're making an immediate threat. I'm going to kill you right now. Whether he moves that pistol or not. An immediate threat, but he'd already made the threat counsel. And as judge Miller pointed out, he certainly hadn't retracted it. And by showing up with a gun in his hand, why would the officer think that he didn't mean what he was threatening to do? Well, because this is not one of those, what do you call tense, tense, uncertain and rapidly evolving situations. There was nothing rapidly evolving here that we had reached the point where he no, because we reached the point where he comes out of the house, he comes out of the house, he goes back in the house and comes out again, Tennessee versus Garner situation. No, I, I submit this is not, I mean, it's certainly tense and it's, it's uncertain, but it's not rapidly evolving. He is standing there with a pistol pointed at the ground and doing nothing. And then he gets shot. Counsel. Now, whether, whether this is sympathetic, I think you'd have a much more sympathetic argument. If the only thing that happened here was the officer arrived in response to a domestic disturbance, knocked on the door and Mr. Weber answered the door with a gun in his hand, pointed at the ground. But you're asking us and the jury to completely ignore the totality of the circumstances and all of the information that was known to the officer prior to his decision to employ deadly force. And I just don't see how this is unreasonable. The officer's justification was he was, he was pointing the weapon at me. He started to, he started to pull that weapon up. That's the officer's justification, which was false, at least according to the district judge. So what you have here is a man standing there with a weapon pointed at the who had not made an immediate threatening gesture. And he gets shot four times with a weapon pointed at the ground. And we went over the eight cases that show that there is indeed a robust consensus. You don't get to do that. And all kinds of interesting, slight variations. It was a shotgun. It was an AK-47 that really wasn't an AK-47. It was a toy. But over and over again, it's the weapon is not pointed at you. You don't get to shoot under those circumstances. Mr. Abney, you're down to about a minute and a half. Do you want to save the rest of your time for rebuttal? I'd love to save about a half hour, but I'll save the remaining time. All right. Thank you. And we'll hear from Mr. Jollison now. Good morning, Judge Schroeder, Judge Miller, Judge Tallman. May it please the court. My name is Jim Jollison. I represent the city of Kingman police officer, Jace Reif, and his spouse. In this matter, we asked the court to affirm the grant of qualified immunity from the district court and the resulting judgment because Officer Reif was subjected to a deadly threat that suspect Michael Weber intended to shoot him if he did not leave the site of a volatile domestic violence investigation. The district court correctly concluded that no clearly established law prohibits the use of deadly force under these circumstances. And I think the concept of these circumstances is illustrated and always has seemed to me dramatically by the Emmons line of cases, Emmons versus city of Escondido, where the ninth circuit originally relied on generalized law to deny qualified immunity. U.S. Supreme court then made clear that what the ninth circuit should have done is said, taking the totality of the circumstances, you should decide if this use of force violates clearly established law. And with that more detailed instruction, the case came back down to the ninth circuit, they analyzed the law with more particularity of more clarity and more clarity than what had just been given. I think that this case is identical to that. I think that the threat that occurred here makes all the difference. And whether Mr. Weber raised the gun or not, is not the linchpin of whether there's a violation of clearly established law. And it's not just the threat of shooting. You know, I think we need to remember that again, in the totality of the circumstances, it's being reported to officer Reeve, who's by himself when this is all happening, that there is a threat to a woman inside a trailer. And that when he gets there, he doesn't hear the sound of a woman in the trailer anymore. There was a threat to the neighbor. Get out of here or I will shoot you. And there was a threat to the officer himself, the same thing. Get out of here or I'll shoot you. Now, do we expect our officers to get out of there under the circumstances to say, well, okay, if that's, what's going to happen to me, I'm going to leave. I don't know what's happening with this woman in the trailer, but I don't want to get shot. No, we expect them to perform their duties and continue the investigation, which is what happened here. But the nature of the threat is really interesting. If you don't get out of here, I'll shoot you. That's never redacted or removed by Mr. Weber as a threat. And what is Mr. Weber's next move is to physically leave the residence with in his hand, the very mechanism to carry out the threat that he had just given, the ability to shoot. And he does that in contravention to the, to the officer's orders that, Hey, I'm a city of Kingman police officer, and I need you to come out of that trailer with your hands up without a gun in your hand. And then you add to that the movement from in front of the door to behind the door and, and then back in front of the door under circumstances where officer still alone has not taken cover yet under, under the truck. There is not a single piece of law from the U.S. Supreme court, the ninth circuit, or a consensus of the circuits that say that deadly force is not allowable under those circumstances. And in fact, I think that the web, the Weber plaintiff seeks to create a rule whereby a police officer responding to this kind of scene under these circumstances does have to wait for the suspect to raise that weapon and point it at them. But I hope we all can recognize that in the real world, by that time, it's too late for the officer. So at the risk of coming across partially, if we create a rule, the deadly force cannot be used where a suspect threatens to shoot an officer and then appears with a weapon capable of immediately affecting that threat until a gun is pointed at the officer, we are placing public servants in a serious position of death or danger of, of serious bodily harm. And the advocacy we make in this case is that the court not create that kind of rule. Policing is difficult enough without exposure to those kinds of dangers and it's not reasonable. But looking at the case law, you know, the one big case that comes to my mind is Casella versus Hughes, U.S. Supreme court, where the threat is, is a woman with a knife on the other side of a chain link fence. And in fact, she's not threatening the other woman who's her roommate on the other side of the chain link fence. The officers nonetheless shoot and the U.S. Supreme court says that that, that does not violate clearly established law. There's been no threat of a stabbing. There's been no threat of violence at all. The knife is being held at, at the side of the suspect. Yet the Supreme court says there's no clearly established law that prevents the use of deadly force under those circumstances. The facts in this case are much more severe, much more severe than the facts that the U.S. Supreme court faced in, in Casella. The other major flaw in the plaintiff's argument is the, is the idea that there isn't an immediate physical or verbal threat against the police officer. What, what do they want and what clearly established law shows it? Does Mr. Weber need to repeat that threat when he opens the door? It's enough that he made it and he made it with enough recency and he showed up now with the means to effect his threat that places officer Reef in danger and justifies the use of deadly force. Now to Mr. Dabney's credit, he provided a wealth of case law in an effort to show that there is some clearly established law out there. But if you look closely at his reply brief, you'll see he admits that from all of the cases that he shows, what is missing is that key element, that key thing that makes the difference between the cases and prevents them from being clearly established law under these facts. And that's the threat that I'm going to shoot you if you don't leave. And in those very same jurisdictions, you see cases like the Phillips versus James case at the 10th circuit, like the Tucker versus Marquette case from the sixth circuit. I'm not going to pronounce this case correctly because I've never seen the name before, but it looks like body Jukova versus Doji from the fifth circuit where the analysis changes when you add the threat. And here we submit that the analysis changes when you add the threat that the officer was facing. So I am going to do something I've probably never done in my whole time of doing oral arguments, except for when Judge Kaczynski at one point made it clear that he really didn't need to hear a word out of my mouth. And I read the cards that he was laying down. Unless you have questions, I think we've made the point in the brief that the judge is correct. Without a violation of clearly established law, there's qualified immunity. And with qualified immunity, Officer Reeve was entitled to the judgment that he got. If there are any questions, I will be happy to entertain them. Looks like there are not. Thank you, Mr. Nelson and Mr. Abney, you have some time for rebuttal. And you're muted. Of course, I sometimes I feel like you're sorry and catch 22. I'm not quite sure what to say without getting myself in trouble. But I think the consensus of cases, the ones we presented and discussed to the court, including precedent from this circuit and from several other circuits, is that unless there's an immediate threat, a physical threat, a verbal threat, immediate threat, then the police do not have the right to shoot a suspect. Even if the suspect is holding a weapon, shotgun, pistol, whatever it might be, as long as that weapon is not pointed at the police officer, you can't just shoot at that point. You need to try something else. Getting behind cover, waiting for help, engaging with the suspect, doing something to defuse the situation. What about telling him to drop the gun? They could repeat that. I don't think when he was outside, I'm not sure exactly the emphasis that was placed on that, especially in the last few seconds before the shots were fired. This was at the end, this went over a number of seconds, eight seconds, 10 seconds or so. After he came out, went back in, came out, a police officer could have backed away and could have waited. I don't, I submit to the court, the reasonable jurors, I don't think that's the way to do things. That this was an unreasonable reaction to the situation. Counsel, haven't our cases focused on the fact that if time permits, a warning should be given before deadly force is employed? And on this record, a warning was given and he failed to abide by the command. Well, you know, to go back to the old West, this isn't high noon. You say, get out of town or I'll shoot you. The next time I see him, just because a warning has been given earlier in the proceedings, doesn't mean that that is the ticket to shoot at the first opportunity you feel that you want to shoot to defuse the situation. You want us to articulate a rule that basically then is going to put officers in a situation of they've got to draw quicker and fire truer. No, we don't need to. That's a thin line between holding a gun at the ground on these facts, where you threatened to kill the officer and saying that you couldn't fire unless the gun was being raised. These are all thin line cases. These are all cases where we rely on police officers to use their training to make sure that they don't go too far. But this is not a situation where, this is not a quick draw situation. The police officer had his weapon up. He had a flashlight in the suspect's eye. He had his weapon aimed and trained at the suspect. And he shot him four times rapidly and killed him. There was never any hint that the suspect had raised that weapon to threaten the police officer. There was no immediate verbal threat, no immediate physical threat. And I know we're on the line. We're always on the line in these kinds of cases. And my heart goes out to everybody involved, not just to the person who, the family, the person who got shot, but to the police officers. This is a terrible situation, but it's one in which the courts really should let juries decide who's right and who's wrong. Thank you. Thank you, Mr. Abbey. Thank you, Your Honor. Thank both counsel for their arguments this morning.  Um, and the cases. Thank you, Your Honor.
judges: SCHROEDER, TALLMAN, MILLER